UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MEDIA PRODUCTS, INC DBA DEVIL'S FILM,<br><br>　　　　　Plaintiff,<br>　　v.<br>DOES 1-162,<br>　　　　　Defendants.<br>_____ | Case No.: C 12-03801 EJD (PSG)<br><br>**ORDER GRANTING-IN-PART PLAINTIFF'S *EX PARTE* EMERGENCY APPLICATION FOR LEAVE TO TAKE LIMITED DISCOVERY PRIOR TO RULE 26(F) CONFERENCE**<br><br>**(Re: Docket No. 4)** |

Plaintiff Media Products, Inc. doing business as Devil's Film ("Devil's Film") applies *ex parte* on an emergency basis for leave to take expedited and limited discovery prior to the Fed. R. Civ. P. 26(f) conference. Devil's Film's application raises the same issues as those previously addressed by the court in *Diabolic Video Productions, Inc. v. Does 1-2099*[1] and *Boy Racer, Inc. v. John Does 2-52.*[2] In each of those cases, the undersigned granted leave to take expedited discovery, but only as to the initial Doe. The court severed or recommended severance of the remaining Does and recommended that the claims against the remaining Does be dismissed without prejudice and, if

---

[1] *See Diabolic Video Productions, Inc. v. Does 1-2099,* No. 5:10-cv-05865-PSG, Amended Order Granting-In-Part Motion for Leave to Take Limited Discovery Prior to Rule 26(f) Conference (Docket No. 16).

[2] *See Boy Racer, Inc. v. Does 2-52,* Case No. 5:11-02834 LHK, Order Granting-In-Part Plaintiff Boy Racer, Inc's *Ex Parte* Application for Leave to Take Limited Discovery Prior to Rule 26(f) Conference (Docket No. 12).

1

re-filed within 20 days, deemed a continuation of the original action for purposes of the statute of limitations.

In *Diabolic,* the undersigned found that the copyright owner had not adequately explained how or why the peer-to-peer architecture of the BitTorrent protocol differed from other file-sharing protocols considered in *Leface Records, LLC,*[3] *Interscope Records,*[4] *BMG Music,*[5] or *Twentieth Century Fox Film Corp.*[6] In each of those cases, the peer-to-peer nature of the protocol was insufficient to justify joinder of dozens of otherwise unrelated defendants in a single action.

Under *Gillespie v. Civiletti*, before allowing expedited discovery to uncover the identity of unnamed defendants, the district courts of this circuit must determine whether either of two conditions applies. The first is whether the requested discovery would fail to uncover the identities sought.[7] The second is whether the claim against the defendant could be dismissed.[8]

As to the first *Gillespie* condition,[9] whether or not the individuals identified are ultimately liable under Devil's Film's theory of infringement, the court is once again informed by the plaintiff that the discovery sought here would uncover the identities sought. Devil's Film seeks leave to subpoena various Internet Service Providers ("ISP") associated with certain IP addresses to produce the names, addresses, email addresses, and Media Access Control numbers associated with each IP

---

[3] No. 5:07-cv-298-BR, 2008 WL 544992 (E.D.N.C. Feb. 27, 2008).

[4] No. 6:04-cv-197-Orl-22DAB, 2004 U.S. Dist. LEXIS 27782 (M.D. Fla. Apr. 1, 2004).

[5] No. 06-01579, 2006 U.S. Dist. LEXIS 53237 (N.D. Cal. Jul. 31, 2006).

[6] No. C 04-04862, Docket No. 12 (N.D. Cal. Nov. 16, 2004).

[7] *See Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir. 1980); *see also Columbia Ins. Co. v. SeesCandy.com,* 185 F.R.D. 573, 577 (N.D. Cal. 1999) ("With the rise of the Internet has come the ability to commit certain tortious acts, such as defamation, copyright infringement, and trademark infringement, entirely on-line. The tortfeasor can act pseudonymously or anonymously and may give fictitious or incomplete identifying information. Parties who have been injured by these acts are likely to find themselves chasing the tortfeasor from [ISP] to ISP, with little or no hope of actually discovering the identity of the tortfeasor. In such cases the traditional reluctance for permitting filings against John Doe defendants or fictitious names and the traditional enforcement of strict compliance with service requirements should be tempered by the need to provide injured parties with a forum in which they may seek redress for grievances.").

[8] *See id.* at 642.

[9] *See id.*

address alleged to have conducted infringing activity. The Nicolini Declaration[10] explains that Copyright Enforcement Group, LLC's proprietary file sharing forensic software captured the unique IP address by which each Doe Defendant allegedly infringed. If provided with the IP address and the date and time of the infringing activity, Devil's Film asserts that the ISP can identify the Doe Defendant because information is contained in the ISP's subscriber activity log files. Devil's Film's claims notwithstanding, the court has serious doubts as to the efficacy of the ISP subpoenas in uncovering the identity of the individuals alleged to have committed infringement. As the court has come to learn in yet another of the recent "mass copyright" cases, subscriber information appears to be only the first step in the much longer, much more intrusive investigation required to uncover the identity of each Doe Defendant.[11] The reason is simple: an IP address exposed by a wireless router might be used by the subscriber paying for the address, but it might not. Roommates, housemates, neighbors, visitors, employees or others less welcome might also use the same address.

Even if the court were not dubious of the plaintiff's ability to meet the first *Gillespie* condition, it is not convinced that Devil's Film can satisfy the second. To address the second *Gillespie* condition and to distinguish the technical architecture of BitTorrent from those file-sharing protocols which other courts have found failed to justify joinder, Devil's Film explains that users of the BitTorrent protocol have a higher degree of interactivity and engage in deep and sustained collaboration with their peers, as follows:

> The process begins with a person who decides that a particular work should be available for free to his/her fellow Internet users. After obtaining a digital file of the work or taking the work and making a digital file copy of it, that person uses a BitTorrent client to create what is called a "torrent file." A torrent file is uniquely associated with the digital file of the work (sometimes referred to as the "content file"). That person, who I will refer to as "the initial seeder," then accesses the Internet through an Internet Service Provider ("ISP") and intentionally makes the content file of the work available on the Internet to the public from his/her computer. That content file on the initial seeder's computer is often referred to as the first or initial "seed." As indicated above, there is a one-to-one relationship between the content file and the torrent file. The torrent file, among other things, points to the content file. While the content file is very large, the torrent file is very small. The torrent file describes the content file that is being distributed, what pieces, often referred to as "blocks" or "chunks," into which the content file is divided, and other

---

[10] *See* Docket No. 4-2.

[11] *See Boy Racer, Inc. v. Doe 1,* Case No. 5:11-cv-02329 PSG, Order Denying Plaintiff's *Ex Parte* Motion for Leave to Take Further Expedited Discovery (Docket No. 21).

>information needed for distribution of the content file. Typically, the title of the torrent file would include the name of the work included in the content file. The initial seeder would make his/her torrent file available on one or more websites. Alternatively, instead of uploading the torrent file to one or more websites, an initial seeder could make a link often referred to in the field as a "magnet link," available on one or more websites. The magnet link os a relatively new medium by which peers can access torrents. Its popularity is due to its not requiring the hosting of any files on a continuously available website. The magnet link is a uniform reference indicator ("URI") scheme similar to a uniform reference locator ("URL") that when clicked, allows the aforementioned torrent file to be downloaded from other peers (at first the initial seeder) connected to the swarm as opposed to an individual web server. In either event, for a piece (or block) of a content file to be copied from one peer from another member of the swarm that is acting as a seeder (e.g., because that other member has at least one block of the content file), both computers must have the same torrent file. The torrent file includes other data such as the separate hashes for each of the pieces into which the content file is divided for BitTorrent P2P distribution. (A "hash" is an alphanumeric string of characters mathematically derived from the characteristics of a file). With the block-hash data, the computer doing the downloading, after it receives a block, does, through the BitTorrent client on its computer, a mathematical analysis of the downloaded block to confirm that the block has the hash that it should. That guarantees that only correct pieces of the content file are copied from one computer to another. . . . With the title of the work being at least part of the torrent file's title, Internet users looking for a work will likely find the torrent file. In fact, people looking to obtain a copy for free could actually search online for the title of the work plus the word "torrent." Persons seeking to download such a work also access the Internet through an ISP (which may or may not be the same ISP as used by the original seeder) and seek out the work on a P2P network.  When such a person finds it, he/she downloads the subject torrent file. Then, opening that torrent file with his/her BitTorrent client, he/she can have his/her computer join the "swarm," that is, join the group of people exchanging the work among themselves. In turn, as each peer receives portions of the seed, most often taht peer makes those portions available to other peers in the swarm. Therefore, each peer in the swarm is at least copying and is usually also distributing pieces of the work at the same time.

Devil's Film goes on to note:

>As more peers join a swarm at any one instant, they obtain the content at even greater speeds because of the increasing number of peers simultaneously offering the content as seeders (or at least partial seeders) themselves for distribution of the work.  In this regard, a swarm that starts with an initial seed may at any later time have tens, hundreds, or thousands of partial and complete seeds. Seeds and peers may enter, leave and re-enter a swarm at any time. As time goes on, the size of the swarm varies, yet it may endure for a long period, with some swarms enduring for 6 months to well over a year depending on the popularity of a particular work.  CEG is monitoring torrent swarms which remain active today even after the original upload of a torrent file was in 2009. As a result, the initial seed file becomes duplicated multiple times by multiple parties, with a potentially exponential increase in the number of copies of any work.  With respect to any particular swarm, the hash (an alphanumeric representation of a digital file) of a torrent file remains the same.

According to Devil's Film, this greater extent of cooperation and concerted action among BitTorrent

1 users than among users of other protocols makes joinder proper here.[12]  Devil's Film also explains
2 that based on geo-location technology, it can show that all of the Doe defendants reside in the
3 Northern District of California and that they intentionally traded the exact same file of the
4 copyrighted work from the exact same source through torrent software. Devil's Film confirmed this
5 activity by reviewing the hashes for each of the downloaded files. Devil's Film contends that it
6 would be unduly burdened by having to file 162 separate lawsuits, and serves neither the interests of
7 Devil's Film nor the court.

8       Even with the description of the BitTorrent technology provided by Mr. Nicolini, the court
9 remains unpersuaded that the peer-to-peer architecture of the BitTorrent technology justifies the
10 joinder of otherwise unrelated defendants in a single action.  First, the Nicolini declaration argues at
11 length about the concerted activity within a <u>given</u> swarm. Presumably he does so in response to the
12 concern highlighted by Judge Ryu[13] and this court in *Boy Racer* that users in <u>different</u> swarms have
13 nothing in common other than downloading the same work, which as this court and others have
14 noted is insufficient under our precedent.  Even if the IP addresses at issue in this motion all came
15 from a single swarm, there is no evidence to suggest that each of the addresses acted in concert with
16 all of the others.  In fact, the lack of information regarding the period covering the activity
17 associated with each of the addresses call into question whether there was ever common activity
18 linking the 162 addresses in this case.  As the court noted in *Boy Racer,* in this age of instant digital
19 gratification, it is unreasonable to conclude that any one alleged infringer of the copyrighted work
20 would patiently wait many weeks to collect the bits of the work from 161 other cooperators.  At the
21 very least, there is no proof that bits from each of these 162 addresses were ever assembled into a

---

[12] This claim that BitTorrent is different from other protocols considered in earlier cases because of its swarming download functionality does not appear to be correct as a factual matter.  For instance, the Kazaa and Gnutella protocols that were at issue in earlier cases have a swarming download feature that works similarly to BitTorrent's.  *See, e.g.,* L. Jean Camp, "Peer to Peer Systems," in Hossein Bidgoli (ed.), *The Internet Encyclopedia* (Wiley, 2004), vol. 3, at 30. ("In order to increase the speed of downloads and distribute the load on peer-provid[ed] files Limeware uses swarming transfers. *See also,* Alex Jantunen, et al., "Peer to Peer Analysis: State of the Art" (Tampere University of technology, 2006) (noting that swarming supporting protocols include at least FastTrack, Gnutella, ED2K/Overnet and BitTorrent).

[13] *See Pacific Century Intern. Ltd. v. Does 1-101,* Case No. 11-02533, Docket No. 7 (N.D. Cal. Jul. 8, 2011).

5

single file.[14]  As the court previously explained, under this court's precedent regarding other file sharing protocols, merely infringing the same copyrighted work over this period is not enough.[15] Finally, nothing in the BitTorrent architecture changes the fact that each defendant also will likely have a different defense.  As the district court in *BMG Music* put it:

> Comcast subscriber John Doe 1 could be an innocent parent whose internet access was abused by her minor child, while John Doe 2 might share a computer with a roommate who infringed Plaintiffs' works. John Does 3 through 203 could be thieves, just as Plaintiffs believe, inexcusably pilfering Plaintiffs' property and depriving them, and their artists, of the royalties they are rightly owed.[16]

Devil's Film's motion is therefore GRANTED, but only as to Doe 1 and as follows.

IT IS HEREBY ORDERED that Devil's Film is allowed to serve immediate discovery on Doe 1's ISP listed in Exhibit A to the Complaint by serving a Rule 45 subpoena that seeks information sufficient to identify Doe 1, including the name, addresses, telephone numbers, and email addresses of Doe 1.  Devil's Film's counsel shall issue its subpoena and shall include a copy of this order.  This subpoena shall be deemed an appropriate order under 47 U.S.C. § 551.

IT IS FURTHER ORDERED that the ISP will have 30 days from the date of service upon it to serve Doe 1 with a copy of the subpoena and a copy of this order.  The ISP may serve Doe 1 using any reasonable means, including written notice sent to Doe 1's last known address, transmitted either by first-class mail or via overnight service.  The ISP and Doe 1 each shall have 30 days from the

---

[14] Empirical research shows that most BitTorrent users do not remain connected for very long after their downloads are complete. One large study observed that only 3.1% of BitTorrent users stayed connected (to upload to others) more than ten hours after their downloads completed; only 0.34% stayed connected over 100 hours. J.A. Pouwelse, P. Garbacki, D.H.J. Epema, and H.J. Sips, *The BitTorrent P2P File-Sharing System: Measurement and Analysis* at 4, in Proceedings of the 4th International Workshop on Peer-to-Peer Systems, *available* at http://www.springerlink.com/content/1251rj2233u051. Another study found that over 90% of users who successfully downloaded a file remained connected for less than a single day, while many users who attempted to download the file gave up entirely and disconnected within the first few hours. M. Izal, G. Urvoy-Keller, E.W. Biersack, P.A. felber, A. Al Hamra and L. Garces-Erice, *Dissecting BitTorrent: Five Months in a Torrent's Lifetime* at 7, in Proceedings of the 5th International Workshop on Passive and Active Network Management Proceedings of the 4th International Workshop on Peer-to-Peer Systems, *available at* http://www.springerlink.com/content/fg8hqw4136t0vtx9.

[15] *See Diabolic Video Productions, Inc. v. Does 1-2099,* No. 5:10-cv-05865-PSG, Amended Order Granting-In-Part Motion for Leave to Take Limited Discovery Prior to Rule 26(f) Conference (Docket No. 16).

[16] *See BMG Music v. Does 1-203,* Case No. 04-650, 2004 WL 953888, at *1 (E.D. Pa. Apr. 2, 2004).

date of service to file any motions in this court contesting the subpoena (including a motion to quash or modify the subpoena). If that 30-day period lapses without Doe 1 or the ISP contesting the subpoena, the ISP shall have 10 days to produce to Devil's Film the information responsive to the subpoena with respect to Doe 1.

IT IS FURTHER ORDERED that the ISP shall not assess any charge to Devil's Film in advance of providing the information requested in the subpoena, and that the ISP that receives a subpoena and elects to charge for ths costs of production shall provide a billing summary and cost reports that serve as a basis for such billing summary and any costs claimed by the ISP.

IT IS FURTHER ORDERED that the ISP shall preserve all subpoenaed information pending the ISP delivering such information to Devil's Film or the final resolution of a timely filed and granted motion to quash the subpoena with respect to such information.

IT IS FURTHER ORDERED that any information disclosed to Devil's Film in response to a subpoena may be used by Devil's Film solely for the purpose of protecting its rights under the Copyright Act, 17 U.S.C. § 101 et seq.

IT IS FURTHER RECOMMENDED that Does 2-162 be severed from this action and Devil's Film's action against Does 2-162 be dismissed without prejudice. The undersigned further recommends that if Devil's Film re-files separate complaints against Does 2-162 within 20 days of this order, such actions should be deemed a continuation of the original action for purposes of the statute of limitations.

**IT IS SO ORDERED.**

Dated: 9/18/2012

PAUL S. GREWAL  
United States Magistrate Judge